# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois,*
**2012 IL App (1st) 101226**

---

| | |
|---|---|
| Appellate Court Caption | ASSET RECOVERY CONTRACTING, LLC, Plaintiff-Appellant, v. WALSH CONSTRUCTION COMPANY OF ILLINOIS, PALMOLIVE TOWER CONDOMINIUM, LLC, PALMOLIVE BUILDING BASE, LLC, AND NATIONAL ELECTRICAL BENEFIT FUND, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-1226 |
| Rule 23 Order filed | August 16, 2012 |
| Rule 23 Order withdrawn | October 29, 2012 |
| Opinion filed | November 1, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from delays in connection with plaintiff's subcontract to perform interior demolition work, extrinsic evidence of schedule revisions was properly considered and delay damages were properly denied pursuant to the "no damages for delay" clause based on plaintiff's agreement to modifications of the schedule with requests for increased costs, and plaintiff's destruction of business claim was denied based on the subcontract's provision barring such consequential damages. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CH-1014; the Hon. Thomas R. Mulroy, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Eckert Seamans Cherin & Mellott, LLC, of Pittsburgh, Pennslyvania (Christopher R. Opalinski and Cornelius J. O'Brien, of counsel), and Conway & Mrowiec, of Chicago (Timothy R. Conway, of counsel), for appellant. |
| | Kubasiak, Fylstra, Thorpe & Rotunno, P.C. (Raymond A. Fylstra and Manuel J. Placencia, Jr., of counsel), and Law Offices of E. Bryan Dunigan (E. Bryan Dunigan, of counsel), both of Chicago, for appellee Walsh Construction Company of Illinois. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Fitzgerald Smith concurred in the judgment and opinion. |

## OPINION

¶ 1                                  Background

¶ 2      The instant case arose from a multimillion dollar redevelopment of the Palmolive Building at 919 North Michigan Avenue, Chicago, Illinois, to convert the commercial office building into residential and retail condominiums. Defendant Walsh Construction Company of Illinois (Walsh) was the general contractor for the "core and shell" phase of the project, which generally entails removal of the interior finishes and mechanical and electrical and plumbing systems in preparation for build-out work. Margaret Walsh was Walsh's senior project manager and was on the site daily beginning in March 2004. Jeff Pezza was Walsh's junior project manager and was on the jobsite daily. Walsh executed a contract with Palmolive Tower Condominiums, LLC (Palmolive), dated August 1, 2003. Pursuant to the terms of the prime contract, Palmolive's designated representatives were agents at Draper and Kramer Inc. (Draper and Kramer).

¶ 3      Walsh entered into various subcontracts for the project, including a subcontract agreement with Asset Recovery Contracting, LLC (ARC), to perform the interior demolition, dated September 12, 2003. After the events related to this construction project, ARC filed

for bankruptcy and then filed the instant lawsuit against the above-captioned defendants. ARC was owned by Daniel Hoffman, who was the company's managing member; James Werner, who served as a project manager, supervisor and estimator; Allen Formeister, who was a project manager and the senior estimator; and Michael McCabe, who was ARC's accountant. Todd Westmoreland was also ARC's project coordinator and worked with Werner and Patricia Gruenke to prepare ARC's estimate for the project. Westmoreland was on the site regularly. Michael Gibbons was one of ARC's superintendents.

¶ 4 ARC decided to bid on the project in 2003. Westmoreland and Gruenke prepared ARC's debris quantity estimate for the project. On March 10, 2003, ARC submitted its initial bid for the project, which assumed a 12-month schedule for a base price of $2.9 million. Werner voiced concerns to Walsh about the various delays on a previous project on which the parties worked, at 175 West Jackson, but was assured that this project would be different.

¶ 5 In July 2003, ARC began work on the project, before ARC and Walsh signed the subcontract agreement. ARC did not sign the subcontract until March 19, 2004 and Walsh did not sign the agreement until May 5, 2004.

¶ 6 The subcontract required ARC to do the following:

"Furnish all labor, materials, equipment, insurance, taxes and supervision as required to fully fabricate, deliver F.O.B. Project and install all Demolition as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor."

¶ 7 The project schedule was attached to the subcontract agreement as Exhibit I, which set forth the timing, sequence and duration of the work of the prime contract. Included were dates related to the timing and sequence of ARC's work under the subcontract. ARC's work was divided into three major areas of the building, to be performed concurrently: (1) the tower (floors 18 through 38); (2) the base (floors 1 through 17); and (3) three basements. The project schedule set forth that ARC's demolition work was to be completed in approximately 19 weeks. There were remaining isolated demolition activities scheduled for later in the project, but the bulk of the demolition work was scheduled to be completed within a four-month period.

¶ 8 ARC's work schedule was critical to the project, as a delay in ARC's demolition work would delay the overall schedule for the redevelopment of the building. The prime contract contained a schedule that was similar to the schedule of the ARC subcontract. Exhibit A of the prime contract contained a set of clarifications dated October 16, 2003, stating that "Walsh Construction has assumed unrestricted access to perform demolition and construction above and below existing tenants." The prime contract further provided that the contract schedule was "predicated on a 10/1/03 Notice to Proceed. If this date is changed, the schedule may have to be accelerated or delayed, at the owner's direction ***."

¶ 9 I. Evidence Regarding Delays Prior to Execution of the Contract

¶ 10 In August 2003, ARC began its work, starting with demolishing the three basement levels of the building. On September 12, 2003, ARC was informed by Walsh at a meeting that the Chicago fire department (CFD) had issued an order prohibiting demolition below any

occupied floor and within two floors above any occupied floor in the building. Walsh requested, and ARC provided, cost estimates for the potential effects of this delay. On September 16, 2003, Werner wrote to Walsh outlining the costs associated with six possible scenarios which could be caused by the CFD order. Scenario six assumed the CFD order would remain in place and stated that the estimate of the cost to ARC would be $390,000. Although at this point in time the subcontract agreement had not yet been signed, ARC did not include this additional cost in the subcontract.

¶ 11      The owner attempted to obtain relief from the CFD's order for the next two months. However, while the owner did so, it allowed its tenants and sales staff, including its agent, Draper and Kramer, to remain in the building, thus effectively preventing any demolition under the prohibition of the CFD's order. Also, at the same time, the owner's funding did not come through as scheduled, which also delayed authorization to ARC to commence its work on all areas except a few selected areas of the basements.

¶ 12      Also, prior to the project, Elizabeth Arden, a tenant in the building, as well as other entities, initiated litigation against Palmolive over concerns about the impending construction. In settlement, Palmolive entered into an agreement (Arden Agreement) which was incorporated into Walsh's prime contract with Palmolive. The Arden Agreement limited the manner of demolition by prohibiting loud work or dropping debris from above the fourth floor of the building during Elizabeth Arden's business hours. ARC's subcontract with Walsh incorporated the restrictions in the Arden Agreement within the prime contract.

¶ 13      On January 15, 2004, ARC wrote a letter to Walsh concerning terms of the proposed subcontract but did not ask for any increased costs. ARC proposed a change whereby Walsh could only "reasonably" change the sequence and pace of ARC's work. Walsh agreed to this modification and it was incorporated into the contract. ARC also proposed the following modification: "there would be no waiver of claims unless Walsh was prejudiced by ARC's failure to give notice." However, Walsh rejected this modification and it was not incorporated into the subcontract. ARC also suggested a provision obligating Walsh to pay for overtime, additional supervision, equipment, expedited material and other additional costs reasonably caused by or attributable to delay, hindrance or interference, but Walsh rejected this modification. ARC did not request an increase in the overall contract price in the subcontract.

¶ 14      On January 20, 2004, Walsh issued a revised project schedule dated January 19 to ARC and all other subcontractors. The revised project schedule increased the duration of ARC's bulk demolition work by an additional seven months through July 23, 2004, and divided ARC's work into more detailed piecemeal demolition in the major project areas. Walsh requested that all subcontractors review the revised schedule and report any problems or objections to Walsh by February 17, 2004.

¶ 15      After receipt of this revised schedule, ARC's project manager, James Werner, sent an e-mail to Walsh's project executive, Jack Keating, enclosing extended overhead cost projections for the revised schedule based on 14 additional weeks. At Keating's request, two weeks later, on February 10, 2004, Werner provided a modified version of the cost projection to one of Walsh's project managers, Jeff Pezza, which included an extended overhead cost

projection of a total of $361,340, and an additional cost of $332,178 for carpet areas for the building.

¶ 16    The minutes of the Walsh February 17, 2004, subcontractor coordination meeting indicated that all dates in the revised schedule were "assumed ok." ARC attended this meeting and no objection is reflected in the minutes of the meeting. ARC and Walsh continued to negotiate the terms of the subcontract through March 18, 2004.

¶ 17    In late February or early March 2004, Margaret Walsh, another project manager for Walsh, returned to the project after an extended leave and, unaware of the delays, issued a letter to ARC objecting to its failure to complete all of its work in the tower, as required by the January 19 schedule revision. In response, Werner sent a letter to Ms. Walsh dated March 3, 2004, which detailed the delays due to the actions and inactions by the owner, the owner's engineers, and Walsh. Werner advised Ms. Walsh that ARC had submitted "change requests of $590,000 (noting including any cost evaluation of the impacts discussed in this letter), of which only $82,000 has been approved for billing." Werner also informed her that "[p]ending changes include work performed as far back as October."

¶ 18                                II. Contract Terms

¶ 19    Notwithstanding these pending ongoing discussions regarding increased costs, ARC executed the subcontract agreement on March 19, 2004. Werner negotiated the subcontract on behalf of ARC from October 2003 through March 18, 2004, with the aid of an attorney. The subcontract was prepared on a Walsh standard contract form and incorporated was Exhibit J, a contract rider, which modifies the terms of the standard form. Additions to the contract were shown in underlined text. Deletions were shown with strikethrough typeface. Specifically, section 2.1 of Exhibit J provides the following:

> "Time is of the essence. Subcontractor will proceed with Subcontractor's Work in accordance with Contractor's schedule as amended by Contractor from time to time. Contractor shall have the right to direct reasonable adjustments, with reasonable advance notice, to the sequence and pace of Subcontractor's Work without monetary compensation to Subcontractor. *** Contractor shall, and shall cause other subcontractors, to likewise make reasonable adjustments to their respective Work, to enable Subcontractor to complete the Subcontract Work in the time required by the Prime Contract between the Owner and the Contractor."

¶ 20    Section 4.3 of Exhibit J set forth the modification of the clause providing for the assertion of a claim by ARC as a subcontractor as follows:

> "Claims. A 'Claim' is a Subcontractor's demand or assertion seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, or relief with respect to the terms of the Contract. All Claims must be made by written notice to the Contractor at least one (1) week prior to the beginning of the Subcontractor's Work or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event. Costs or delays occurring more than one week prior to such notification, if any, whichever shall first occur, otherwise, such claims

shall be deemed waived. Pending final resolution of a Claim, unless otherwise agreed in writing, the Subcontractor shall proceed diligently with performance of the Subcontractor's Work and the Contractor shall continue to make payments in accordance with this agreement. <u>Contractor shall provide reasonable verification, if requested by Subcontractor, of Subcontractor's costs for performing disputed work, without acknowledging the validity of a Claim.</u>"

¶ 21    Section 4.4 of the subcontract agreement provides the following regarding delay:

"Delay. If the progress of the Subcontractor's Work is substantially delayed, hindered or interfered with through no fault or responsibility of the Subcontractor, then the Contractor shall either (i) extend the time for the performance of Subcontractor's Work by Change Order, but such extension shall be limited to that amount of time which will enable Contractor to meet its obligation to Owner to compete the Project in accordance with the Contract Documents, or (ii) have the right to order Subcontractor to accelerate its Work with additional manpower and the expediting of materials, but Contractor shall be obligated to pay only for the costs of expediting material.

Except for the costs of expediting materials at the order of Contractor pursuant to the previous paragraph, the Contractor shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delay, hindrance, interference or other similar event, caused by Contractor, by any act, negligence, or default of the Owner or Architect/Engineer, or by reason of fire, casualty, act of God or any other reason beyond the Contractor's control. It is expressly understood and agreed that the Subcontractor's sole and exclusive remedy for any delay, hindrance, interference or other similar event, shall be an extension in the time for performance of the Subcontractor's Work."

¶ 22    Section 4.4 of the rider added the following language to section 4.4 of the subcontract agreement:

" 'Notwithstanding anything to the contrary contained in this Contract, in the case of any Claim by Sub against GC relating to delays, hindrance or interference of Sub's Work cause by the acts or omissions of Owner, Sub agrees that it shall be entitled to recover against GC only to the extent that GC is entitled to recover from Owner for such delays, hindrance or interference under the terms of the Prime Contract.' "

¶ 23    Section 8.3.1 of the supplementary conditions of the prime contract between Walsh and the owner (Palmolive) gave Walsh a right to an extension of time as a remedy for delays and provided the following:

"8.3.1. If the Contractor is delayed at any time in the progress of the Work by any act or omission of the Owner, the Architect or other contractors hired by the Owner or by labor disputes, fire, unusual delay in transportation, adverse weather conditions as hereinafter described, unavoidable casualties, or any other causes beyond the Contractor's reasonable control (but not including delays caused by Subcontractors or material suppliers for reasons other than those which are beyond the control of such Subcontractors or material suppliers), then the date(s) established for Substantial and Final Completion shall be extended by Change Order for a period not exceeding the

length of such delay if promptly after the commencement of any such delay, the Contractor delivers to the Owner a written notice of such delay stating the nature thereof and the manner and cost of the action to be taken by Contractor to remedy the delay, in a timely manner following the expiration of any such delay provides a written request for extension of the Substantial or Final Completion Date(s) by reason of such delay and such request is approved by the Owner, which approval shall not be unreasonably withheld. Failure to deliver any such notice or request promptly and timely shall constitute an irrevocable waiver of any extension of the Substantial and Final Completion Date(s) by reason of the cause in respect of which such notice and request were required.

In the event of any unpermitted delay, in addition to and without prejudice to any other remedies of the Owner, the Contractor shall pay to the Owner upon demand (and the Owner shall be entitled, if the Owner so elects, to offset from any sum payable to the Contractor) the amount of any actual or direct (not consequential) loss as a result of such delay."

¶ 24 Section 8.1.9(i) of the addendum to the prime contract provided:

"The following costs shall not be reimbursable as a Cost of the Work:

(i) Costs incurred as a result of any delay, whether or not a 'Permitted Delay' under Section 8.3.1 of the General Conditions, as supplemented, except as expressly permitted under Section 8.3.3 of the Supplementary Conditions attached hereto and made a part hereof."

¶ 25 Article 8.3.3 of the supplementary conditions provided:

"8.3.3. Extension of time shall be the Contractor's sole remedy for delay, unless the same shall have been caused by acts constituting intentional interference by the Owner with the Contractor's performance of the Work, and where and to the extent such acts continue, after the Contractor's notice to the Owner of such interference. The Owner's exercise of any of its rights or remedies hereunder shall not under any circumstances by construed as intentional interference with the Contractor's performance of the Work."

¶ 26 Thus, the limitations in these provisions applicable to Walsh against the owner also applied to the recovery ARC would be entitled to against Walsh under section 4.4 of the rider to the subcontract agreement.

¶ 27 Section 5.1 of the subcontract provided:

"5.1. Site Resources. Subcontractor acknowledges that, in order for Contractor to coordinate and manage the work required by the Contract Documents, it will be necessary for Contractor to allocate access and access to work areas, utilities, storage space, and other characteristics of the project site and the project work ('Site Resources') and certain trades may be given preference, at the discretion of Contractor, to Site Resources in order to maintain the optimum project schedule as determined by Contractor.

Accordingly, as long as Contractor acts in good faith in allocating Site Resources and, notwithstanding any other provision of this Agreement or the Contract Documents, *Subcontractor waives any and all claims for damages, extensions of time or for increase*

*to the Subcontract amount as the result of any delay*, disruption, interference, obstruction, hindrance, suspension, acceleration, constructive acceleration, out-of-sequence work, change or other cause arising from Contractor's allocation of Site Resources." (Emphasis added.)

¶ 28 At trial, counsel for Walsh asked Werner why he underlined this provision in an earlier draft of the contract. The court allowed this question despite an objection based on the parol evidence rule, and Werner testified that he asked for the removal of this provision from the subcontract but Walsh would not agree to such a modification. Werner thus agreed to section 5.1 in the terms of the subcontract.

¶ 29 The subcontract also conditioned ARC's right to payment from Walsh upon Walsh's receipt of payment from the owner in section 3.6:

"3.6. Time of Payment. If Subcontractor is in compliance with this Subcontract and if, and only if, Owner pays Contractor, which is an express condition precedent to Contractor's duty to pay Subcontractor, Progress Payments shall be due to Subcontractor no later than ten (10) days after receipt of payment from Owner by Contractor, provided Subcontractor remains in compliance with the terms of this agreement."

¶ 30 Further, section 1.2 of the subcontract, called the "flow-down" provision by Walsh, contained a limitation on ARC's rights against Walsh and provided the following:

"1.2. Mutual Obligations. The Subcontractor assumes toward Contractor all the obligations, risks and responsibilities that Contractor by the Contract Documents has assumed toward the Owner and the Subcontractor is bound to the Contractor by those obligations in the same manner as the Contractor is bound by the Owner. In addition to the Contractor's rights and remedies under this Agreement, Contractor shall also have the benefit of all rights and remedies against Subcontractor which Owner, under the Contract Documents, has against the Contractor. *However, Subcontractor's rights against Contractor* (as opposed to Subcontractor's obligations, risks, responsibilities and limitations) *shall be limited solely to the rights and remedies provided to the Subcontractor under this Agreement without regard to any rights and remedies afforded by the Contract Documents*." (Emphasis added.)

¶ 31 ARC did not sign the subcontract until March 19, 2004 and Walsh did not sign the agreement until May 5, 2004. Directly above the signature lines was the following provision:

"By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. The Subcontractor will complete all Work for the Subcontract amount."

¶ 32 The subcontract specified that ARC would complete the project for $3,190,000. It did not contain any provision for the additional costs ARC was aware of at the time ARC executed the subcontract on March 19, 2004. At trial, Werner also acknowledged that he did not seek any modification which would allow ARC to recover consequential damages.

¶ 33 The subcontract also contained an integration clause in section 12.5, which provided that

the subcontract agreement "represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral."

¶ 34      III. Evidence Regarding Delay Costs After the Execution of the Contract

¶ 35      On April 20, 2004, ARC sent Walsh a letter regarding costs for remobilization of equipment and the loss of chutes to remove debris from certain floors. Pursuant to this letter, ARC and Walsh agreed that ARC would waive its claims for costs for remobilization and for the costs of moving debris via elevator in exchange for Walsh assuming certain safety work that was within the scope of ARC's subcontract. Walsh performed its part of this so-called "swap agreement."

¶ 36      A contract change order dated April 23, 2004, provided for an increase of $141,174 in the subcontract price, but the contract time remained unchanged.

¶ 37      On April 29, 2004, ARC sent a letter to Walsh with the subject line "Request for Change Order: Extended Schedule Costs." The letter detailed the various schedule changes, including the owner's funding delay, the CFD order, and various extended costs due to the delays.

¶ 38      James Werner testified that at a meeting on June 3, 2004, ARC was directed to resubmit its claims for additional costs to Walsh so that Walsh could pass the claim on to Draper and Kramer under the prime contract. Doug Kowert, the senior vice president of the project, Margaret Walsh, Jack Gargrove, and Mike Gibbons were present on behalf of Walsh. Werner, Dan Hoffman, Al Formeister and Todd Westmoreland were present on behalf of ARC. Jeff Pezza testified that Kowert told ARC "come back to me with something that's reasonable." Margaret Walsh testified that Kowert "advised ARC that if they felt they had a claim that was defensible, that was per our contract, that we could submit to Draper & Kramer to do that." Formeister testified that "[e]verybody was in agreement that the job had changed. The question was how do they present it to the owner." Formeister also testified that Kowert did not indicate Walsh believed ARC was not entitled to any additional money, but that Kowert stated "the claim was a definite claim but had to be put together properly for them to present it to the owner."

¶ 39      On August 4, 2004, ARC submitted a letter to Walsh, addressed to Rosetti and Ms. Walsh, with the subject line, "Request for Equitable Adjustment." In this letter, ARC calculated all its additional costs due to the changes to the original schedule, as well as for work done through July 30, 2004, which totaled $2,326,486.

¶ 40      An August 13, 2004, letter from Draper and Kramer asked Walsh to limit heavy demolition activities due to the risk of incurring lawsuits from the tenants in the building. Draper and Kramer asked Walsh to review "this scheduling issue with your field" and advise of new estimate turnover dates.

¶ 41      ARC sent a letter to Walsh dated August 24, 2004, with the subject line, "Completion Options, Costs, and Impacts," detailing the cost to date for the final schedule of $325,053, and also including cost estimates for various demolition allowance options, including the use of certain chutes. ARC wrote that these excess costs "are having a devastating and material effect on ARC's ability to conduct its business, and ARC [i]s unable to continue without

significant relief." In August 2004, ARC requested $500,000 in order to "protect its business stability."

¶ 42     In a letter from Walsh to Draper and Kramer dated September 8, 2004, Walsh advised Draper and Kramer that "Walsh and ARC have modified the methods that debris" is dumped, and that this method "will still allow a semi productive demolition shift, but delays the overall schedule of completion ***. The additional costs for this recent impact are being assembled by ARC and will be presented to Draper and Kramer within the next week." In another letter from Walsh to Draper and Kramer dated September 17, 2004, Walsh stated that the additional delays due to tenant complaints about noise resulted in forcing an extension of the demolition schedule for approximately 10 weeks, and attached an additional compensation and revised completion schedule.

¶ 43     In a letter dated September 24, 2004, Walsh advised Draper and Kramer that it had received ARC's "Request for Equitable Adjustment" for additional costs due to the project delays and that it was "reviewing this claim for accuracy," and that, "[u]pon Walsh Construction's thorough review and critique of this claim, the claim will be presented to Draper and Kramer for their review. Walsh Construction does anticipate that the subcontractor is due additional compensation for these issues."

¶ 44     The minutes of a meeting attended by Walsh and Draper and Kramer dated September 30, 2004, reflect that Walsh advised that ARC submitted its claim for $2.2 million, but that Walsh "believe[s] that the claim is close[r] to $700-$800K. To be negotiated." The minutes also reflect that "Draper & Kramer/Walsh discussed the reality that ARC is due additional general conditions compensation for extended time on site." A contract change order issued by Walsh to ARC dated November 1, 2004, provided for another increase of $210,238 to the original subcontract price.

¶ 45     On October 8, 2004, Maragaret Walsh sent an e-mail to Werner outlining Walsh's request to Palmolive for the $500,000 ARC had requested to "protect its business." Walsh submitted a change order request to Draper and Kramer on November 16, 2004, providing for the amount of $500,000. Palmolive paid Walsh this amount to ensure ARC completed its work. Walsh deducted $185,057 from the $500,000, claiming it was money ARC owed to Walsh for costs incurred by Walsh in supplementing ARC's workers, and paid the balance of $314,943 to ARC. On November 22, 2004, ARC accepted this amount. The total amount Walsh paid ARC was $3,235,115, which constituted the original contract price plus the additional $500,000 to protect ARC's business, minus costs incurred by Walsh for its labor and other costs.

¶ 46     However, demolition work was still further delayed, and ARC left the project without completion. ARC subsequently filed for bankruptcy. ARC ceased doing business in January 2005 and filed the instant action.

¶ 47     Walsh and the previous Palmolive defendants moved for summary judgment against ARC, and Walsh also additionally moved to dismiss count IV of the complaint for *quantum meruit* and unjust enrichment. On September 7, 2007, the court denied the motions for summary judgment and the motion to dismiss. On November 8, 2007, the court granted the previous Palmolive defendants' motion for summary judgment. On October 9, 2007, Walsh

filed a motion for clarification of the September 7, 2007 order, which did not address whether ARC could recover consequential damages under *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145; 9 Exch. 341, seeking damages for the destruction of ARC's business. Following argument on December 11, 2007 on the motion for clarification, the court modified the September 7 order and granted partial summary judgment to Walsh on ARC's claim for consequential damages. On April 8, 2009, ARC filed a motion for reconsideration of the partial summary judgment on the consequential damages claim. On June 6, 2009, the court granted the motion for reconsideration, but stated that it would treat the motion for summary judgment on this claims as a motion to strike. The court's order stated: "Motion for Summary Judgment on this issue as a Motion to Strike the $2.4 million value loss claim and will have a hearing on the Motion to Strike on July 6, 2009 ***."

¶ 48    At the hearing, ARC presented the testimony of Werner and Hoffman. Werner testified that before ARC began work on the project he voiced concerns to Walsh about "the prolonged nature of the change orders" on the 175 West Jackson project previously. On cross-examination, however, Werner conceded ARC had the opportunity to request modifications to the subcontract but did not ask for any provision allowing consequential damages. Hoffman testified that he had similar concerns but that the Walsh representatives said the project would be "different" from the 175 West Jackson project. Hoffman also testified that after the subcontract was executed ARC advised Walsh that it would go out of business if it was not paid for delay damages. Hoffman conceded, however, that ARC and Walsh never agreed that Walsh would be liable to ARC for consequential damages. After the hearing, the court granted the motion to strike ARC's destruction of business claim.

¶ 49    Trial was held on October 2, 5-8, 13 and 14, 2009. The trial court found against ARC on its claims against Walsh. The trial court found that ARC breached the subcontract by leaving the project early and entered a judgment for damages in favor of Walsh in the amount of $337,020 on Walsh's counterclaim.

¶ 50    In its factual findings, the trial court found that the revised schedule changed the original completion date from late December 2003 to July 23, 2004. The trial court also found that "ARC received and reviewed the revised schedule and raised no objections to the cost projections or the impact that might result from the revised schedule." Thus, the court concluded that by accepting changes to the project schedule ARC waived its claims for additional compensation. Also, the trial court considered the date of ARC's signature, and not the date listed on the contract, as the effective date of the subcontract.

¶ 51    On August 26, 2011, we granted ARC's motion to dismiss the appeal as to certain defendants and dismissed any appeal as to counts I and II and all mechanic's lien claims in the underlying complaint, with prejudice. We also specified in our order that Walsh Construction Company was the sole remaining defendant. All issues regarding count III raised in the parties' briefs on appeal remain before us.

¶ 52                                          ANALYSIS

¶ 53    ARC argues that the trial court erred in the following: (1) considering extrinsic

documents and circumstances in interpreting the subcontract agreement[1]; (2) barring ARC from recovering damages for delay pursuant to the "no damages for delay" clause where other terms of the subcontract agreement and judicial exceptions would allow such damages where the delays more than tripled the anticipated duration of the work and were due to the owner and beyond the reasonable contemplation of the parties; and (3) granting Walsh's motion to strike and on ARC's destruction of business claim.

¶ 54                                        I. Considering Parole Evidence

¶ 55    ARC first argues that the court erred in considering extrinsic evidence in: (1) interpreting the operative date of the subcontract agreement; (2) the schedule for performance of ARC's work under the agreement, and (3) concluding that ARC considered the changes to the schedule reasonable and effectively waived the "time is of the essence" clause in section 2.1 of Exhibit J to the subcontract.

¶ 56                                        A. Operative Date of Subcontract

¶ 57    First, ARC argues that the court erred in finding that the operative date of the subcontract agreement as March 19, 2004, when ARC executed the subcontract, as opposed to September 12, 2003, the date stated at the top of the subcontract as the date of the agreement. Our review from a trial court's interpretation of a contract as a matter of law is *de novo*. *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 44 (citing *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 58    The trial court considered the facts of the parties' continuing negotiations and found that the date of ARC's execution was the effective date. However, the trial court erred in considering extrinsic evidence on this issue. Under the four corners rule of contract interpretation, "[a]ll conversations and parol agreements between the parties prior to the written agreement are so merged therein that they can not be given in evidence for the purpose of changing the contract or showing an intention or understanding different from that expressed in the written agreement." *Armstrong Paint & Varnish Works v. Continental Can Co.*, 301 Ill. 102, 106 (1921). In applying this four corners rule, a court initially looks to the language of the agreement alone. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). If the language is unambiguous, then the trial court interprets the agreement without resort to parol evidence. *Air Safety*, 185 Ill. 2d at 462. However, if the court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity

---

[1]ARC lists as a second issue "[w]hether the trial court erred in its determination as to the intention of the parties to incorporate changes to the sequence, pace and duration of ARC's work made during the first 7 months of the Project, without compensation to ARC, where such determination was diametrically opposed to the manifest intention of the parties as evidenced by the contract and their course of dealing." However, this issue is actually subsumed within the first issue of whether the trial court erred in considering extrinsic evidence in interpreting the contract.

is present, and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *Air Safety*, 185 Ill. 2d at 462-63.

¶ 59　　Although some previous cases have suggested that extrinsic evidence may be provisionally admitted even where a contract is facially unambiguous if there is an external ambiguity, this court has held that unless our supreme court announces otherwise, we continue to be bound to follow the four corners approach as set forth in the Illinois Supreme Court case of *Armstrong*. *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874, 880 (2004), *appeal denied*, 214 Ill. 2d 552 (2005). Whether contract language is ambiguous and requires extrinsic evidence for interpretation is a question of law subject to *de novo* review. *River's Edge*, 353 Ill. App. 3d at 878.

¶ 60　　Under our *de novo* review, we determine there was no ambiguity in the contract regarding the effective date. Here, the subcontract clearly states at the top of the face of the document, "Date of Agreement: September 12, 2003." The certification clause immediately above the signature lines specifically provides the following:

> "*By executing this Agreement, the Subcontractor certifies that it is fully familiar with all the terms of the Contract Documents, the site conditions of Project*, and the climatic and physical conditions under which the Subcontractor's Work is to be performed, and enters into this Agreement based upon its investigation of all such matters and is not relying on any opinions or representations of the Contractor. *The Subcontractor will complete all Work for the Subcontract amount*." (Emphases added.)

¶ 61　　The date on the contract of September 12, 2003, was one of the terms of the contract which ARC was certifying it was aware of. See *In re Estate of Graff*, 117 Ill. App. 3d 900, 902 (1983) (the decedent's signature on note constituted *prima facie* evidence that the contents of the note, including the fact that it was dated a week prior to his signature, were known to him, and his act of signing the note was an adoption and ratification of the effective date of the note). Pursuant to the certification clause above the parties' signatures, Walsh also certified this was the effective date of the contract when it executed the subcontract on May 5, 2004. Thus, any parol evidence regarding the effective date of the contract should not have been considered.

¶ 62　　The trial court's finding that the date of ARC's execution of the contract was the effective date of the contract is incorrect. We reiterate the long-standing observation of our courts that the date of execution of a contract is not necessarily the date of the contract. " '[I]t is elementary that ordinarily a contract speaks from the day of its date, regardless of when it was executed and delivered.' " *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1003 (2010) (quoting *Monahan v. Fidelity Mutual Life Insurance Co.*, 148 Ill. App. 171, 174 (1909)). Illinois courts have permitted the "relation back" theory of contract effectiveness: "that is, contractual terms may be effective for a period before the contract is executed, so long as such coverage is clear from the face of the contract." (Emphasis omitted.) *Grubb & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050, 1054 (7th Cir. 1990)

¶ 63　　Walsh argues in its brief that both *Monahan* and *Grubb & Ellis* are inapplicable because in those cases "the courts held that a contract must *expressly* state that it takes effect at an earlier time." (Emphasis in original.) We find no such limited holding in *Monahan*. Also, the

only reference we can find to such a limitation in *Grubb & Ellis* is one isolated citation, in a string citation, to a case from Georgia. See *Grubb & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d at 1054 (citing *American Cyanamid Co. v. Ring*, 286 S.E.2d 1, 3 (Ga. 1982) ("[T]he effective date of a contract is not the date of execution where the contract expressly states that its terms are to take effect at an earlier date.")). This is not the law in Illinois. As is clear from Illinois precedent, the date on the contract is ordinarily the effective date, and where the contract is executed later, its contractual terms relate back and are effective from the date of the contract if such coverage is clear from the face of the contract, as it is here.

¶ 64    Even if we were to hold that consideration of extrinsic evidence of the parties' conduct was permissible, the determination that ARC's date of execution was the effective date of the contract was error. "It is well settled that a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988) (citing *Amelco Electric Co. v. Arcole Midwest Corp.*, 40 Ill. App. 3d 118, 124 (1976)). See *Landmark Properties, Inc.*, 172 Ill. App. 3d at 383-84 (affirming grant of summary judgment in favor of defendant architect seeking arbitration based on a contract with the plaintiff developers to provide services for a project despite the fact that the contract was never signed or returned to the architect). See also *Amelco Electric Co.*, 40 Ill. App. 3d at 125 (holding that although the subcontractor did not sign the agreement, the subcontractor became bound by its acts and conduct to the subcontract's provisions). "For a course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question." *Landmark Properties, Inc.*, 172 Ill. App. 3d at 383. Here it is undisputed that the conduct of both ARC and Walsh at all times related to the subcontract dated September 12, 2003. Thus, even considering the extrinsic evidence, the conduct of the parties established that the date of September 12, 2003 was the effective date.

¶ 65    We find under our *de novo* review that the trial court's finding that the date of execution was the effective date of the agreement binding ARC was error. Nevertheless, this error was harmless and does not affect the outcome of this case, as the trial court reached the correct legal conclusions regarding the no-damages-for-delay clause.


¶ 66            B. Extrinsic Evidence of the Schedule for Performance of ARC's Work

¶ 67    ARC argues the trial court erred in considering extrinsic evidence of schedule changes. ARC contends that the parties "would have attached those revised schedules as part of the Subcontract" had they intended to be bound by the revised schedules rather than the original schedule attached to the subcontract. "In Illinois, a written contract is presumed to include all material terms agreed upon by the parties, and any prior negotiations or representations are merged into that agreement; extrinsic evidence, parol or otherwise, of antecedent understandings and negotiations is generally inadmissible to alter, vary, or contradict the written instrument." *K's Merchandise Mart, Inc. v. Northgate Limited Partnership*, 359 Ill. App. 3d 1137, 1143 (2005) (citing *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 514 (1995) (parol evidence rule)). " 'The parole evidence rule generally precludes evidence of understandings not reflected in the contract, reached before or at the time of its

execution, that would vary or modify it[s] terms.' " *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 53 (2009) (quoting *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 757-58 (2004)).

¶ 68　　Here, however, the evidence did not seek to vary or contradict the terms of the subcontract. Though ARC contends the attached initial schedule was an unalterable term, the subcontract provisions specifically provided for changes and amendment to the work schedule. Section 2.1 of the subcontract specifically provides: "Subcontractor will proceed with Subcontractor's Work in accordance with Contractor's schedules as amended by Contractor from time to time. Contractor shall have the right to direct the sequence and pace of Subcontractor's work." The parties agreed to a modification of section 2.1 in Exhibit J to the subcontract whereby Walsh would have "the right to direct reasonable adjustments, with reasonable advance notice, to the sequence and pace" of ARC's work without monetary compensation to ARC. Section 2.2 further provides: "This schedule shall be revised as required by the conditions of the Work, and shall be subject to Contractor's approval." Section 4.1, titled "Changes," provides: "When the Contractor so orders in writing, the Subcontractor, without nullifying this Agreement, shall make any and all changes in the Work which are within the general scope of this Agreement. Adjustments in the Subcontract Amount of Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order pursuant to the Contract Documents."

¶ 69　　The subcontract is replete with provisions providing for schedule changes and delays. Evidence of the schedule changes did not vary or modify the subcontract's terms. Thus, the parol evidence rule does not apply to exclude such evidence in this case under the subcontract. The trial court correctly considered evidence of revisions to the schedule in the project.

¶ 70　　In *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265 (1994), our supreme court held that the parol evidence rule could not preclude a party from offering proof of the change of schedule terms allegedly agreed to during an oral proposal that were consistent with and would supplement but not contradict the subcontract agreement. *J&B Steel Contractors*, 162 Ill. 2d at 275. The court allowed the extrinsic evidence because it concluded the contract was not a fully integrated contract where it did not specifically provide for a completion date.

¶ 71　　Here we find the contract was completely integrated, as it contained all essential terms and an integration clause, but was facially ambiguous regarding potential delays in the schedule. If contract language is ambiguous and susceptible to more than one meaning, extrinsic evidence may be considered. *Air Safety*, 185 Ill. 2d at 462-63. Although the initial schedule was attached as an exhibit, thus supplying the initial target completion date, the plentitude of contract provisions regarding schedule changes and delays rendered the contract ambiguous as to whether the attached schedule would be a firm schedule. The changes in the schedule did not contradict the terms of the subcontract. The trial court's consideration of extrinsic evidence of the schedule changes therefore did not violate the parol evidence rule.

-15-

¶ 72                           C. Extrinsic Evidence That ARC Considered the
                                      Changes to the Schedule Reasonable

¶ 73        Third, ARC argues that the court improperly considered parol evidence in concluding
that ARC considered the changes to the schedule reasonable and effectively waived the "time
is of the essence" clause in section 2.1 of Exhibit J to the subcontract. However, as explained
above, the trial court did not err in considering extrinsic evidence regarding changes to the
schedule, as the subcontract was facially ambiguous regarding whether the schedule was
firm, and such evidence did not contradict the terms of the subcontract. Also, even where the
contract contains an express clause stipulating that "time is of the essence," Illinois courts
will inquire into the situation of the parties and the underlying circumstances to determine
whether a delay in performance resulted in a " 'material breach.' " *Chariot Holdings, Ltd.
v. Eastmet Corp.*, 153 Ill. App. 3d 50, 58 (1987) (citing *Janssen Brothers, Inc. v. Northbrook
Trust & Savings Bank*, 12 Ill. App. 3d 840, 844 (1973)). We consider "whether the plaintiff
knew at the time the contract was made" about the delays of which it later complains. *John
Burns Construction Co. v. City of Chicago*, 234 Ill. App. 3d 1027, 1037 (1992). Thus,
consideration of extrinsic evidence regarding whether ARC considered the changes
reasonable was not error.

¶ 74        ARC also argues that the trial court's finding that the parties considered the changes to
the schedule reasonable was against the manifest weight of the evidence. The interpretation
of contracts generally is subject to a *de novo* standard of review, and the factual findings that
inform the interpretation are given deference on review and are to be reversed only where
they are against the manifest weight of the evidence. *International Supply Co. v. Campbell*,
391 Ill. App. 3d 439, 447 (2009). A factual finding is against the manifest weight of the
evidence if the opposite conclusion is plainly evident, or where the decision is unreasonable,
arbitrary or without a basis in the evidence. *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 836
(2005).

¶ 75        We determine the trial court's finding on this issue was not against the manifest weight
of the evidence. At the time of ARC's execution of the subcontract, it already knew of the
various delays caused by the Arden Agreement restrictions, it knew of the delays caused by
the CFD order, it knew of the owner's troubles with financing, and it knew of the continued
occupancy of certain tenants. The first revised schedule was in October 2003. ARC did not
object and did not request any modification to the subcontract to provide for delay damages.
Another revised schedule followed in January 2004, substantially revising the schedule of
the project, and ARC again raised no objection and did not request any modification
providing for delay damages. Rather, ARC continued performing its work under the
subcontract and merely exercised its right to submit a claim for additional costs. ARC knew
of all the delays, yet did not request a modification to the subcontract allowing for delay
damages, but rather executed the subcontract and proceeded with its work thereunder.

¶ 76        ARC argues that the subsequent change orders show that ARC did not consider the
changes to be reasonable. However, the fact that ARC continued to perform under the
subcontract and submitted claims for additional costs under the very terms of the contract
evidences that it was regarding the contract as still in force and effect. The manifest weight

of the evidence of ARC's conduct supports the trial court's finding that ARC waived any contention that the delays were unreasonable. "[T]he parties to a contract may waive delays in performance by words or conduct which indicates an intention to regard the contract as still in force and effect even where the terms are in writing or where time is of the essence." *Omni Partners v. Down*, 246 Ill. App. 3d 57, 63 (1993) (citing *Barnes v. Brown*, 193 Ill. App. 3d 604, 610 (1990), and *Kitsos v. Terry's Chrysler-Plymouth, Inc.*, 70 Ill. App. 3d 728, 731 (1979)). Further, "[a]ccording to the principles of waiver and estoppel, a party to a contract may not lull another party into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Vandevier v. Mulay Plastics, Inc.*, 135 Ill. App. 3d 787, 792 (1985) (citing *Graubremse GMBH v. Berg Manufacturing & Sales Co.*, 417 F.2d 1201, 1204 (7th Cir. 1969), quoting *Stewart v. Meyers*, 353 F.2d 691, 694 (7th Cir. 1965), and *Botti v. Avenue Bank & Trust Co. of Oak Park*, 103 Ill. App. 3d 1052, 1054 (1982)). We determine the court's finding that the parties considered the delays reasonable was not against the manifest weight of the evidence.

¶ 77                     II. Interpretation of Delay Damages Provision of Subcontract

¶ 78        ARC next argues that the trial court erred in holding that ARC was not entitled to delay damages because it misinterpreted section 4.4 of the subcontract, and because it failed to apply exceptions to a "no damages for delay" clause. Whether a "no damages for delay clause" bars a contractor's claim for delay damages is a question of contract interpretation. We review issues of contract interpretation *de novo*. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

¶ 79                     A. Interpretation of Section 4.4 of the Subcontract

¶ 80        The trial court determined that section 4.4 of Walsh's subcontract with ARC barred ARC's claims. Paragraph 4.4 of Walsh's contract with ARC provides that, "[n]otwithstanding anything to the contrary contained in this [sub]contract," ARC is entitled to recovery against Walsh to the same extent that Walsh is entitled to recover against the owner.

¶ 81        Walsh argues ARC waived delay damages in section 4.4 of the subcontract, section 2.1 of the subcontract, and section 1.2 of the subcontract and section 4.3.10 of the prime contract. Walsh also relies on paragraph 1.2, which it describes as a "flow-down" clause, whereby ARC's rights against Walsh are limited to Walsh's rights against the owner. Further, Walsh argues that because ARC waived delay damages against the owner in article 8.3.3 of the supplementary conditions of the prime contract, ARC similarly cannot claim any such damages against Walsh. We agree with Walsh.

¶ 82        Section 1.2 of the subcontract provided that ARC's rights would be limited "solely" to the rights and remedies provided in the subcontract agreement.

¶ 83        Section 4.4 of the subcontract agreement provided, in relevant part:

> "Except for the costs of expediting materials at the order of Contractor pursuant to the previous paragraph, *the Contractor shall not be liable to the Subcontractor for any*

-17-

*damages or additional compensation as a consequence of delay, hindrance, interference or other similar event*, caused by Contractor, *by any act, negligence, or default of the Owner* or Architect/Engineer, or by reason of fire, casualty, act of God *or any other reason beyond the Contractor's control. It is expressly understood and agreed that the Subcontractor's sole and exclusive remedy for any delay, hindrance, interference or other similar event, shall be an extension in the time for performance of the Subcontractor's Work.*" (Emphases added.)

¶ 84    Section 4.4 of the rider to the subcontract further provided:

" 'Notwithstanding anything to the contrary contained in this Contract, in the case of any Claim by Sub against GC relating to delays, hindrance or interference of Sub's Work caused by the acts or omissions of Owner, *Sub agrees that it shall be entitled to recover against GC only to the extent that GC is entitled to recover from Owner for such delays, hindrance or interference under the terms of the Prime Contract.*' " (Emphasis added.)

¶ 85    ARC waived delay damages in section 5.1 of the subcontract, which provided:

"*Subcontractor waives any and all claims for damages, extensions of time or for increase to the Subcontract amount as the result of any delay*, disruption, interference, obstruction, hindrance, suspension, acceleration, constructive acceleration, out-of-sequence work, change or other cause arising from Contractor's allocation of Site Resources." (Emphasis added.)

¶ 86    Article 8.3.1 of the supplementary conditions of the prime contract gave Walsh the right to an extension of time to meet the substantial and final completion date(s) where Walsh's progress was delayed by any act or omission of the owner, the architect, other contractors or any other causes beyond Walsh's reasonable control. Article 8.3.3 of the supplementary conditions provided that an extension of time would be Walsh's "sole remedy for delay, unless the same shall have been *caused by acts constituting intentional interference by the Owner* with the Contractor's performance of the Work." (Emphasis added.) Thus, ARC waived delay damages, and pursuant to the subcontract and prime contract, ARC's only basis for recovery for delay damages would be where the owner intentionally interfered with Walsh's work on the project.

¶ 87    ARC argues that the trial court erred in refusing to find intentional interference by the owner such that ARC would be entitled to recovery under the above provisions. ARC argues that the owner was responsible for the delays because it allowed the tenants to remain in the building, causing a continuing halt to the project under the Chicago fire department order. ARC also relies on the incorporation of the implied term that the owner will not obstruct or delay the performance of construction for the erection of a building under Illinois law, citing *North Shore Sewer & Water, Inc. v. Corbetta Construction Co.*, 395 F.2d 145, 151 (7th Cir. 1968). ARC further urges us to recognize this additional exception to a no damages for delay clause that is recognized in other jurisdictions–"active interference" by a contracting party. ARC argues that "[t]he evidence demonstrated that Palmolive actively and repeatedly interfered with ARC's progress and, therefore, ARC is entitled to recovery, even if its damages constitute 'delay damages' within the meaning of § 4.4."

¶ 88    However, "active interference" by a party is not one of the recognized exceptions to "no

damages for delay" clauses in Illinois. Also, the trial court's refusal to make the factual finding of intentional interference by Palmolive so as to apply the limited exception in the prime contract was not against the manifest weight of the evidence. The evidence showed that the CFD issued an order which caused delays on the project due to the continued occupancy by several tenants in the building, including Draper and Kramer, Palmolive's agent. While generally the knowledge and conduct of agents are imputed to their principals, an exception to this rule exists where the agent's interests are adverse to those of the principal. *McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 589 (2009) (citing *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86 (1999)). Draper and Kramer's continued occupancy was adverse to the interests of Palmolive in obtaining clear occupancy of the building to allow work on all floors of the building. The manifest weight of the evidence did not establish that the actions of Draper and Kramer could rightfully be imputed to Palmolive to establish intentional interference with the construction project. On this point the evidence was insufficient and the trial court properly refused to recognize this extremely limited exception under the prime contract and application to ARC under section 4.4. of the subcontract.

¶ 89    Walsh additionally argues that delay damages were waived by ARC's "Swap Agreement." However, ARC replies that the damages it sought excluded all costs that were encompassed in the "Swap Agreement," which constituted only a waiver of ARC's claims for costs for remobilization and for the costs of moving debris via elevator in exchange for Walsh assuming certain safety work that was within the scope of ARC's subcontract. We find from our review of the record that the trial court's finding that delay damages sought by ARC did not include any costs associated with the "Swap Agreement" was not against the manifest weight of the evidence, and thus Walsh's argument on this point is not well-founded. Rather, we conclude that delay damages were barred by the subcontract provisions and, in turn, the prime contract.

¶ 90    Further, we note that ARC was paid a substantial sum by Walsh for work on the project, a total of $3,235,115. The subcontract provided for the initial contract price, which ARC bid for the project, and also provided for change order requests which ARC utilized for additional costs. The subcontract, however, clearly barred delay damages. ARC agreed to the clear terms of the subcontract, which barred delay damages. The trial court did not err.

¶ 91              B. Exceptions to "No Damages for Delay" Clauses

¶ 92    Second, ARC also argues that the trial court erred in determining delay damages are barred where it refused to apply the exceptions to such clauses barring recovery. Delay damages are those damages caused by delay in the completion of a project. *Bates & Rogers Construction Corp. v. Greeley & Hansen*, 109 Ill. 2d 225, 230 (1985) (citing *Herlihy Mid-Continent Co. v. Sanitary District of Chicago*, 390 Ill. 160, 165 (1945)). "No damages for delay" clauses are enforceable though they are construed strictly against those who seek their benefit. *J&B Steel Contractors*, 162 Ill. 2d 265, 276 (1994). Illinois recognizes the following exceptions to such "no damages for delay" clauses: delay caused by " 'bad faith' "; delay " 'not within contemplation of parties' "; delay of " 'unreasonable duration' "; and delay

attributable to " 'inexcusable ignorance or incompetence of engineer.' " *J&B Steel Contractors*, 162 Ill. 2d at 277 (citing *John Burns Construction Co. v. City of Chicago*, 234 Ill. App. 3d at 1033). ARC argues that the trial court erred in failing to apply two exceptions: (1) that the delays were not within the contemplation of the parties; and (2) that the delays were of unreasonable duration.

¶ 93       First, according to ARC, the delays on the project were not within the contemplation of the parties at the time of the subcontract. On this issue, we review evidence as to what the parties contemplated at the time of execution of the contract. "Delays and obstructions not within contemplation of the parties at the time the agreement was executed necessarily lie beyond the contract's intended scope." *J&B Steel Contractors*, 162 Ill. 2d at 278. "Such delays and obstructions and their causes have been held to remain actionable despite no-damage-for-delay clauses." *Id.*

¶ 94       We find the trial court did not err in refusing to apply the exception that the delays were not within the contemplation of the parties at the time the subcontract was executed. The trial court properly applied the reasonable foreseeability test and determined the delay was reasonably foreseeable. The CFD order delaying the project was issued September 10, 2003, and the various delays due to continued occupancy of the tenants were well known to ARC prior to ARC's execution of the subcontract. The evidence at trial established that Walsh indeed revised the project schedule prior to ARC executing the subcontract on March 19, 2004. Pursuant to the certification clause, ARC agreed to be bound to the subcontract while fully acknowledging the site conditions. Notwithstanding any such site conditions, by executing the subcontract ARC agreed it "will complete all Work for the Subcontract amount."

¶ 95       Second, we also determine the trial court did not err in refusing to apply the unreasonable duration exception to the "no damages for delay" clause. The trial court properly found the schedule changes were reasonable because ARC had notice of them, and because ARC had the opportunity to negotiate different terms, including total contract price, prior to execution of the contract but did not do so. The manifest weight of the evidence supports the trial court's finding.

¶ 96       The manifest weight of the evidence in this case also establishes that ARC, by its conduct in continuing to perform and submitting requests for increased costs, waived any argument that the delays here were of unreasonable duration. Further, ARC negotiated for, and obtained, a modification to the subcontract whereby Walsh could only "reasonably" change the sequence and pace of ARC's work.

¶ 97       "Parties to an agreement may waive delays in performance by conduct which indicates an intention to regard the agreement as still in force and effect." *Bank of Wheaton v. Village of Itasca*, 178 Ill. App. 3d 626, 632 (1989) (citing *Swerdlow v. Mallin*, 131 Ill. App. 3d 900, 904 (1985), *Botti v. Avenue Bank & Trust Co. of Oak Park*, 103 Ill. App. 3d 1052, 1054 (1982), and *Kitsos v. Terry's Chrysler-Plymouth, Inc.*, 70 Ill. App. 3d 728, 731 (1979)). "This is true even where the agreement provides that extensions must be in writing or where time is of the essence." *Bank of Wheaton*, 178 Ill. App. 3d at 632 (citing *Kitsos*, 70 Ill. App. 3d at 731). "In such a case, the court may extend the term of the agreement for a 'reasonable

time,' and what constitutes a reasonable time is a question of fact." *Bank of Wheaton*, 178 Ill. App. 3d at 632 (citing *Kitsos*, 70 Ill. App. 3d at 732). The trial court's refusal to find that the delays were of an unreasonable duration was not against the manifest weight of the evidence where ARC agreed to perform under the revised schedules.

¶ 98 ARC nevertheless argues that the sheer length of time extending a 4-month project to over a 14-month project establishes an unreasonable delay. However, our supreme court has upheld a no damages for delay clause where there has been a delay of one year. See *Bates & Rogers Construction Corp. v. Greeley & Hansen*, 109 Ill. 2d 225, 232-33 (1985) (affirming judgment denying damages pursuant to a "no damages for delay" clause as a result of no electrical service being furnished to work site until more than a year after required and denial of access to material portion of work, including cost overruns and lost profits). Thus, the mere length of the delay, by itself, does not establish unreasonable delay.

¶ 99 III. Granting Motion to Strike Destruction of Business Claim

¶ 100 Finally, ARC argues that the court erred in granting Walsh's motion to strike ARC's destruction of business claim. ARC contends that a *de novo* standard of review applies to the trial court's grant of Walsh's motion to strike ARC's claim for consequential damages under section 2-1110 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1110 (West 2004)). However, section 2-1110 applies to motions in a nonjury case for a finding in the defendant's favor at the close of plaintiff's case at trial. 735 ILCS 5/2-1110 (West 2004). Here, we are reviewing a determination of a motion to strike, and not a motion for a finding at the close of plaintiff's evidence at trial. The motion to strike was decided separately *before* trial and was in the context of summary judgment proceedings. Walsh initially sought to dispose of this claim in its summary judgment motion. However, after a motion for clarification, the court treated the motion as a motion to strike the claim for damages for destruction of business. Section 2-1110 is therefore inapplicable.

¶ 101 Although ARC's basis for the standard of review is incorrect, the *de novo* standard of review is correct. We review the issue *de novo* because the motion to strike arose in the context of summary judgment proceedings and because we are presented with a question of law whether the evidence was sufficient to establish such a claim for damages. We have consistently recognized that the appropriate standard for reviewing a motion to strike in the context of a summary judgment motion is *de novo*. See, *e.g.*, *Collins v. St. Paul Mercury Insurance Co.*, 381 Ill. App. 3d 41, 46 (2008); *Camco, Inc. v. Lowery*, 362 Ill. App. 3d 421, 428 (2005); *Filliung v. Adams*, 387 Ill. App. 3d 40, 51 (2008). Also, where review of the trial court's ruling on a motion to strike raises a question of law, the appropriate standard of review is *de novo*. *Camco, Inc.*, 362 Ill. App. 3d at 428. The transcript of the July 6, 2009, hearing shows that the trial court made a determination that ARC had not established its *prima facie* case for consequential damages, which necessitates *de novo* review. See *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098 (1994), *appeal denied*, 162 Ill. 2d 566 (1995) (holding that here the trial court determined only that the plaintiff had failed to make out a *prima facie* case as a matter of law, the trial court's decision was reviewed under a *de novo* standard of review). See also *In re Petition to Disconnect Certain Territory Commonly*

*Known as the Foxfield Subdivision & Adjoining Properties from the Village of Campton Hills*, 396 Ill. App. 3d 989, 992 (2009) ("Because whether a plaintiff has failed to present a *prima facie* case is a question of law, the trial court's ruling is reviewed *de novo* on appeal.").

¶ 102    In general, a plaintiff is entitled to recover damages under a contract theory only to the extent provided by the terms of the written instrument. *Hidden Grove Condominium Ass'n v. Crooks*, 318 Ill. App. 3d 945, 947 (2001). ARC argues that consequential damages are not barred by the subcontract agreement and that such consequential damages were reasonably foreseeable and within the contemplation of the parties. We disagree. The subcontract and the prime contract establish that such consequential damages were not available to Walsh in the prime contract and therefore not recoverable by ARC under its subcontract with Walsh. As discussed earlier, section 4.4 of the rider to the subcontract provided that ARC could recover against Walsh only to the extent Walsh was entitled to recover from the owner for delays under the prime contract. Article 8.3.3 of the supplementary conditions provided that "[e]xtension of time shall be the Contractor's sole remedy for delay, unless the same shall have been caused by acts constituting intentional interference by the Owner with the Contractor's performance of the Work."

¶ 103    Thus, such consequential damages are barred. Although ARC contends it made Walsh aware that ARC's business would be ruined if there were protracted delays, ARC still executed the subcontract, certifying its knowledge of the terms. The trial court did not err in granting Walsh's motion to strike ARC's claim for such damages. Therefore, we affirm the decision of the trial court.

¶ 104                                CONCLUSION

¶ 105    We determine that although the trial court erred in considering extrinsic evidence of the effective date of the subcontract because the subcontract itself unambiguously provided the effective date, the trial court did not err in considering extrinsic evidence regarding the schedule revisions. Evidence of the schedule revisions did not contradict the terms of the subcontract, which specifically provided for schedule changes, and thus the parol evidence rule is inapplicable to bar such evidence. The trial court also did not err in barring delay damages under the subcontract's "no damages for delay" clause where delays were within the reasonable contemplation of the parties and ARC agreed to modifications of the schedule with requests for increased costs. Finally, the trial court did not err in granting the defendant's motion to strike the plaintiff's claim for destruction of business where the subcontract barred such consequential damages.

¶ 106    Affirmed.