NOTICE

Decision filed 05/08/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250511-U

NO. 5-25-0511

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| SHOPPES at ST. CLAIR CMBS, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 22-LM-80 |
| | ) | |
| WASABI SUSHI BAR SEVEN, LLC d/b/a WASABI | ) | |
| SUSHI BAR and WASABI MANAGEMENT CO., INC., | ) | Honorable |
| | ) | Patrick R. Foley, |
| Defendants-Appellants. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's finding that there was a leak on the leased premises is affirmed where the finding was supported by circumstantial evidence and was not against the manifest weight of the evidence; the trial court's conclusion that defendants breached the lease by failing to pay the water bill is affirmed where the issue was not raised on appeal; the trial court's conclusion that defendant breached the lease by failing to pay for the repairs associated with the water leak was contrary to language in the lease agreement and therefore judgment is reversed on that issue along with the award of administrative fees and interest associated therewith; and the award of attorney fees is reversed and the case is remanded to allow the trial court to revisit the issue in a manner consistent with this decision.

¶ 2   Defendants, Wasabi Sushi Bar Seven, LLC d/b/a Wasabi Sushi Bar (Wasabi Sushi) and Wasabi Management Co., Inc. (Wasabi Management) (collectively Wasabi), appeal the trial court's ruling in favor of plaintiff, Shoppes at St. Clair CMBS, LLC. (Shoppes at St. Clair),

1

stemming from the contractual dispute involving an alleged leaking water pipe. For the following reasons, we affirm, in part, and reverse, in part.

¶ 3                                    I. BACKGROUND

¶ 4     On October 5, 2022, Shoppes at St. Clair filed a two-count complaint against Wasabi. Count I alleged a breach of lease against Wasabi Sushi stemming from a commercial lease in which Shoppes of St. Clair leased space to Wasabi Sushi. Count II requested collection on the guaranty signed by Wasabi Management, as guarantor for Wasabi Sushi, with regard to the commercial lease attached to the complaint.

¶ 5     On June 23, 2011, Shoppes at St. Clair entered into a lease agreement that leased 2,700 square feet classified as space #3-A to Wasabi Sushi for 10 years. Section 1.2 of the lease stated that "Tenant shall pay all utility charges relating to the Leased Premises which accrue after Landlord's tender of possession." Section 2.5 of the lease reiterated this language by requiring Wasabi to

> "pay promptly as and when the same become due and payable, all water rents, rates and charges, all sewer rents and all charges for electricity, gas, heat, steam, hot and/or chilled water, air conditioning, ventilating, lighting systems and other utilities supplied to the Leased Premise."

In addition to addressing who was responsible for the water bill, section 1.2 also described the leased premises stating,

> "The Leased Premises shall extend to the exterior faces of the exterior walls or to the building line where there is no wall, or the center line of those walls separating said premises from other leased premises in the Shopping Center, together with the appurtenances specifically granted in this Lease, but reserving and

2

excepting to Landlord or its designee the right to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines and wire through hung ceiling space, column space, and partitions, in or beneath the floor slab or above or below the Leased Premises or other parts of the Shopping Center, except that Landlord shall not reasonably interfere with or interrupt the business operations of Tenant within the Leased Premises, and except where necessary as determined by Landlord's architect, no pipes, conduits, utility lines, or wires installed by Landlord shall be exposed in the sales area of the Leased Premises."

¶ 6 Section 6.1 of the lease required the landlord to make "necessary structural repairs to the exterior walls *** necessary repairs to the roof, foundations, load bearing items, plumbing, pipes, and conduits located outside the Leased Premises and/or in the common areas." Section 6.2 of the lease required the tenant to

"make and pay for all repairs to the Leased Premises and all equipment and systems serving the Leased Premises exclusively and shall replace all things which are necessary to keep the same in a good state of repair and operating order, such as (but not limited to) all fixtures, furnishing, lighting, and store signs of Tenant. Tenant shall also maintain, replace, and keep in good repair and operating order all components exclusively serving the Leased Premises, whether located within or without the Leased Premises, including but not limited to air conditioning, ventilating, plumbing, sprinklering, heating, and electrical installations, ceilings, inside walls, carpeting, and floor surfaces."

If the tenant failed to make the necessary repairs and the landlord made the repairs, tenant would be responsible for the landlord's costs to repair plus 15% as an administrative fee.

3

¶ 7    Section 11.2 addressed what was considered default on the lease and section 11.5 provided enforcement expenses that entitled the prevailing party to reimbursement of court costs, reasonable attorney fees in both the trial and appellate court, as well as other reasonable expenses. Section 12.11 defined interest as Prime Rate plus two percentage points and stated that if tenant failed to pay when due, any sum payable to the landlord under the terms of the lease, interest would "accrue from and after the date on which any such sum shall be due and payable, and such Interest together with a late charge of Two Hundred Dollars" due when payment was made.

¶ 8    The last paragraph of the lease agreement stated,

> "Rider to Lease. A Rider to lease number consecutively herewith and attached hereto is hereby made part hereof. Any conflict or inconsistency between the terms of the main body of the Lease and the terms of the Rider shall be resolved in favor of the terms of the Rider."

A Lease Rider was attached that stated section 2.5 of the Lease was supplemented by language that stated,

> "Environmental Charge. Landlord and Tenant acknowledge and agree that the utilities served the Leased Premises, including electrical service, water/sewer service, are separately metered and such service shall be obtained, at Tenant's sole cost and expense, through the applicable utility provider. The Leased Premises is served by a rooftop HVAC unit at Tenant's sole cost and expenses. There are no Environmental Charges under this Rider A payable to the Landlord by Tenant."

¶ 9    Drawings of the leased location were included as exhibits A and A-1 to the lease. Exhibit B of the lease included a construction component. Section 1.1 stated that Wasabi would take the leased premises "as is." However, the exhibit further stated,

4

"Tenant acknowledges that, in order to create 2700 square feet in the Leased Premises, certain modifications are necessary to incorporate into the Leased Premises approximately 1,500 square feet of Space #3-B and approximately 1,200 square feet of Space #3-A, which modifications include, at Tenant's sole cost and expense, the demolition of the demising wall between the existing Space #3-B and Space #3-A. In addition, Tenant shall perform all other work necessary in order to incorporate the Leased Premises as a single, integrated unit, including the extension and/or capping off of the sprinkler, electrical, water, sewer and HVAC systems currently existing in the existing Space #3-B and Space #3-A, however, in the event the aforementioned systems are not existing, Tenant shall perform all work necessary to provide such systems. Furthermore, Tenant agrees to repair, at Tenant's cost and expense, any damage caused to any adjacent premises to the Leased Premises due to Tenant's work, including, but not limited to, the extension and or capping off of any utilities in the adjacent premises which were damaged or altered by Tenant's work."

¶ 10     A copy of a guaranty, executed by Wasabi Management, was also attached to the complaint along with a lease extension executed on September 30, 2021, that extended the lease until February 28, 2022. The extension, which increased the rent, specifically left the remaining terms and conditions from the original lease "unchanged and in full force and effect."

¶ 11     Shoppes of St. Clair's complaint alleged that in January 2022 a water leak was discovered and repaired. It alleged that the leak stemmed from a water pipe that serviced only Wasabi Sushi's leased premises. Attached to the complaint in addition to the lease, guaranty, lease rider, and lease extension, were two letters from Shoppes of St. Clair to Wasabi Sushi requesting payment related

to the water leak. The first letter, sent May 10, 2022, requested payment of $6,263.94 related to the unpaid water bills stemming from the water leak and further warned that if the lease went into default, Wasabi Sushi would also be liable for interest, late charges, future rent, and attorney fees. The second letter sent on August 16, 2022, again requested payment and further stated that while "the exact location of the leak was not identified," A&H Mechanical Contracting, Inc. (A&H) capped the water line that was exclusively servicing Wasabi Sushi's space, connected a new line from that capped line to service that space, and that action stopped the leak. Shoppes at St. Clair's complaint alleged total damages of $28,914.04 in count I and included costs from the water bill, repairs, interest, late charges, the 15% administration fee, and attorney fees from Wasabi's failure to abide by the lease terms. Attached to the complaint was an Illinois Supreme Court Rule 222(b) affidavit verifying that the total money damages did not exceed $50,000.

¶ 12    On December 5, 2022, Wasabi Sushi filed an answer. However, the record on appeal only contains an illegible copy of that document.

¶ 13    On January 5, 2023, Shoppes at St. Clair filed a motion for summary judgment. The motion requested judgment in favor of Shoppes at St. Clair and requested damages in the amount of $32,233.39 based on the uncontroverted terms of the lease and affidavits attached to the motion. Attached to the motion was an affidavit by Scott Summers, an employee with A&H. The affidavit stated that A&H received a call regarding a water leak on February 11, 2022. Summers and his team arrived on February 18, 2022. They did not find leaking water but did see that a water meter for Wasabi Sushi was spinning as if there was a leak in the water line servicing the restaurant. They were unable to discover a leak but did not have access to the Wasabi Sushi space. The affidavit further stated that Summers and his team returned on February 24, 2022, at which time they were granted access inside the restaurant and were able to turn off the incoming water service.

6

The area of concern was located and they "identified that the leak was either outside of the Wasabi restaurant under the sidewalk or under the Wasabi restaurant building slab." On March 3, 2022, Summers returned with his team and dug up a 5-foot by 5-foot area of the sidewalk but found no leak under the sidewalk. They returned again on March 17, 2022, and broke up half the bathroom floor. Again, no leak or signs of a leak were found but they did find the water service to that bathroom. Summers and his team returned and excavated the interior men's bathroom floor where they found an old service water line that was a dead line. After contacting the city and determining that the line was unusable, A&H had the city shut the line down. They then excavated farther along the exterior of the building and found the two-inch water line dedicated to the Wasabi Sushi restaurant. A&H capped that water line between the meter and the restaurant and performed a pressure line test on the line between the meter and the cap. After finding the test was good and capping that dedicated water line, the leakage stopped. Based on these actions, Summers concluded, "The leak was obviously a leak of the dedicated water line between the cap [and] the Wasabi building."

¶ 14    The affidavit further indicated that to restore water service, A&H "continued excavation, tunneled under the Wasabi Sushi foundation, and ran new 1 ¼ inch poly service from the existing two-inch dedicated line (from the other side of the cap away from the building) that we had already tested into the Wasabi building." That was connected to the existing 1 ¼ inch copper in the Wasabi restaurant office wall. Summers opined that it was "conclusive that the existing leak was somewhere under the slab of the space for Wasabi and somewhere in the dedicated water line, dedicated to Wasabi, between where the line was capped and the Wasabi restaurant." He explained that to save expenses, they stopped demolition of the floor to replace the entire dedicated line, and instead, they ran a new line from the other side of the cap and connected to the existing line in

7

Wasabi's office wall. The invoices for repair of the leak totaled $15,785. Copies of the invoices were attached to Summers's affidavit.

¶ 15    A second affidavit by Michael Hagen, the manager for Shoppes at St. Clair, was also attached to the motion for summary judgment. That affidavit addressed the lease with Wasabi Sushi, the lease extension, and the guarantees. Hagen's affidavit also stated that a water leak was suspected in January 2022 because the water meter for Wasabi Sushi's dedicated water line showed a significant amount of constant usage although the business no longer occupied the building. Hagen did not see any water and Wasabi would not respond, so Hagen called A&H who eventually identified the leak from a water pipe that serviced Wasabi's premises and repaired the leak.

¶ 16    On March 31, 2023, Wasabi Sushi filed a response and objection to the motion for summary judgment. Therein, Wasabi Sushi argued that the plain language of the lease required the court to find that Shoppes at St. Clair was liable for the repairs and expenses at issue. It argued, citing section 6.1 of the lease, that the water leak was in the pipe outside of its business premises and therefore the liability was with Shoppes at St. Clair.

¶ 17    On June 15, 2023, the trial court issued an order denying Shoppes at St. Clair's motion for summary judgment. The court noted that Shoppes at St. Clair "unequivocally asserted that the repairs it made [were] as the result of a leaking water *pipe*." (emphasis in original). The court also noted that the term "pipe" appeared in section 6.1 of the lease that identified Shoppe's at St. Clair's responsibilities and did not appear in section 6.2 of the lease that identified Wasabi's responsibilities. The court further found that it was unclear from the affidavits and statements of uncontroverted material fact "whether the leak requiring the repairs at issue occurred within or without the Premises."

8

¶ 18    On November 9, 2023, the trial court set the matter for a bench trial on November 12, 2024. On November 7, 2024, a pretrial hearing was held in which neither Wasabi nor its lawyer appeared. The court issued an order again stating the bench trial was set for November 12, 2024.

¶ 19    The bench trial was held on November 12, 2024. Neither Wasabi nor its lawyer appeared. Jonathan Scott Summers testified that he was a licensed plumber for 34 years. The court took judicial notice of section 2 of the Illinois Plumbing License Law (225 ILCS 320/2 (West 2022)). Summers reviewed Plaintiff's Exhibit No. 5 which was a drawing reflecting the work performed. He stated that several individuals, including the water department, verified that the water leak was not in the exterior of the foundation, from the foundation to the meter. They found no leak inside the foundation after breaking up the floors either. They hooked onto the existing line, capped it to pressurize it to verify with the city that the leak was not on the exterior of the building. Ultimately, they bypassed it, eliminating the old lines underground, ran a new line across the floor, under the slab and reconnected into Wasabi's existing water shut off valve, restoring water at that time and bypassing what was underground. Summers testified that the leak had to have been from inside the foundation underneath the slab in the space for Wasabi. He stated that the cost of the repair was $15,785 and the waterline at issue served Wasabi solely.

¶ 20    Michael Hagen testified that Wasabi Sushi approached him stating that the water department contacted them and said they had a water leak in their space and significant water usage going on inside their space. He stated that in anticipation of opening a new location, Wasabi vacated the premises a month or two before the lease terminated, which was before the leak. He then stated that the water department first notified him of the problem. He discussed the lease and stated that the word "appurtenances" in section 1.2 included all the piping that was in the slab. He agreed that section 6.1 required the landlord to repair all plumbing or pipes located outside of the

9

leased premises and the common areas. He stated that there were no leaks outside of the premises. He agreed that section 6.2 stated that the tenant was responsible for the repair and maintenance of the leaks occurring from the leased premises.

¶ 21    Hagen further testified that when Wasabi Sushi first came to them to lease the location, it was two separate locations that were metered individually for water and electricity. Shoppes of St. Clair paid a "tenant allowance" to Wasabi Sushi so they could do the work to create their leased area. The construction was to take two spaces and combine them into one restaurant space. Money was set aside to reimburse Wasabi Sushi for the construction expense to combine the utilities in that space and build out the restaurant interior. Hagen confirmed that Wasabi Sushi hired the contractor to perform that work and Shoppes of St. Clair eventually reimbursed $270,000 to Wasabi Sushi for the work that was performed. He further testified that "by process of elimination," the leak could only have been within the footprint of Wasabi Sushi.

¶ 22    Following the hearing, the court issued a ruling in favor of Shoppes at St. Clair in the amount of $45,963.96. It found Wasabi Sushi and Wasabi Management jointly and severally liable for that amount. Counsel for Shoppes at St. Clair was to submit a written judgment to the court.

¶ 23    On November 12, 2024, Wasabi Sushi filed an objection to entry of judgment and order, after Shoppes at St. Clair advised Wasabi's counsel that it was submitting a proposed judgment order following the trial earlier that day. The objection stated that Wasabi's counsel never received the November 9, 2023, case management order setting the case for trial. He argued that Wasabi Sushi had a meritorious defense and requested the court provide them an opportunity to present it.

¶ 24    On November 13, 2023, the trial court entered a judgment in favor of Shoppes at St. Clair, noting that neither Wasabi nor its counsel appeared at the November 12, 2024, trial. The judgment

10

awarded Shoppes at St. Clair $45,963.96 and listed Wasabi Sushi and Wasabi Management jointly and severally liable.

¶ 25    On December 2, 2024, Wasabi Sushi and Wasabi Management moved to vacate the default judgment pursuant to section 2-1301(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1301(e) (West 2022)). On January 3, 2025, Shoppes at St. Clair responded to the motion and requested the court deny the motion. A hearing on the motion was held on January 9, 2025, and the court took the matter under advisement. On January 15, 2025, the court issued an order granting Wasabi's motion to vacate the default judgment but required Wasabi to pay attorney fees and costs incurred by Shoppes at St. Clair, along with any expert witness fees and costs. The order also set the case for a bench trial on February 21, 2025. On February 3, 2025, Shoppes at St. Clair filed a memorandum of fees and costs setting the amount due at $1,275.00. Payment was issued by Wasabi on February 5, 2025.

¶ 26    The bench trial took place on February 21, 2025. The transcript from the November 12, 2024, hearing was placed into evidence. Scott Summers testified similarly to the testimony provided at the November 12, 2024, hearing. Once again, he stated that they were called out for an unknown water leak for the Wasabi Sushi space, determined there was no leak on the exterior of the building and therefore concluded that the leak had to be somewhere inside the foundation under the slab. After they capped the old line and reconnected a new line to the existing water service, the leak stopped. He confirmed that they never saw any gushing water and never found a leak underneath the slab. He believed the leak was fixed because the water meter stopped spinning once the old line was capped and the new line was hooked up.

¶ 27    On cross-examination, Summers stated that they went to the location four or five times from February 11, 2022, through March 31, 2022. He confirmed that they broke concrete on both

11

the interior and exterior of the building and found no leak. He stated that after a discussion with Hagen, it was decided to quit breaking up the concrete to find the leak and instead run a new water line into the building through the existing wall and bypass what was under the concrete. He agreed that the only reason they stopped looking for the leak on the inside of the building was because Hagen told them to stop looking.

¶ 28    On redirect examination, Summers confirmed there was a leak below the foundation on the Wasabi premises. He also confirmed that the water line was dedicated solely to Wasabi Sushi.

¶ 29    On recross examination, Summers again confirmed that no water leak was found. He stated it was the city's responsibility to determine whether the meter was properly functioning. He assumed there was a leak but never saw the leak and saw no evidence of the 850,000 gallons of water that escaped.

¶ 30    Michael Hagen was called to testify and he read the third paragraph of section 1.2 that stated the boundaries of the leased premises and the reservation to the landlord to "install, maintain, use, repair and replace pipes, duct work, conduits, utility lines and wires through hung ceiling spaces, column space and partitions in or beneath the floor slab or above or below the leased premises or other parts of the shopping center." He then read section 6.1 that stated the landlord responsibilities that included "necessary repairs to the roof, foundation, load bearing items, plumbing pipes and conduits located outside the leased premises." He stated that the leaking water pipes were inside the leased premises. He was asked to read section 6.2 which stated, "Tenant shall make and pay for all repairs to the leased premises and all equipment and systems servicing the leased premises exclusively and shall replace all things which are necessary to keep the same in good state of repair and operating order." Hagen confirmed that the pipes that serviced Wasabi Sushi were exclusive to the leased premises. Hagen continued to read section 6.2 that stated,

12

"Tenant shall also maintain, replace and keep in good repair and operating order all components exclusively serving the leased premises whether located within *** or without the leased premises including but not limited to air conditioning, ventilating, plumbing, sprinkling, heating and electrical installations, ceiling, inside walls, carpeting and floor surfaces."

Hagen agreed that the plumbing pipes were located within the leased premises. He continued to read section 6.2 which stated, "Tenant shall at all times keep the leased premises and all exterior entrances, exterior walls, glass and shoe moldings, partitions, doors, floor surfaces, fixtures, equipment and appurtenances thereof in good order, condition and repair and in a reasonably satisfactory condition of cleanliness."

¶ 31    Hagen further testified about the two separate tenants in the location prior to the Wasabi lease. He explained that the ice cream parlor was combined with the remaining parts of the Wasabi space. Pursuant to the lease, water lines, electricity, and gas lines needed to be combined and the tenant was responsible for buildout costs and would hire their own contractor to do that work. The lease stated that the landlord would have no responsibility for that construction. He explained the tenant allowance that was used to reimburse Wasabi for the construction. Hagen further addressed the guaranty attached to the lease signed by Wasabi Management and explained that those were typical unless it was a national tenant.

¶ 32    Hagen testified that the water company called him, after they could not reach Wasabi Sushi, to advise of extremely high water usage, indicative of a leak. Hagen called Wasabi but they would not address the situation. Hagen testified that he did not have access to the building, so John Kim, the CEO of Wasabi Management Company, brought him keys and they discussed the leak. Hagen stated that at that time, Kim agreed to pay the water bill. He stated that neither Kim nor Wasabi

13

ever paid the water bill. He identified the correspondence from the water company for the usage from December 1, 2021, to February 4, 2022, and the bill for $6,188.94. Shoppes at St. Clair paid the water bill as well as the A&H invoice. He agreed that interest in the amount of $5,907.79 attached to the $21,973.94 invoices from the water company and A&H. He also received and paid the attorney fees throughout the litigation except for those reimbursed following the vacated previous judgment and addressed the 15% administration fee and the late fee, which amounted to total damages of $52,544.05.

¶ 33    On cross-examination, Hagen explained his position as the senior general manager at Shoppes at St. Clair. He stated that their legal department prepared the contract. He again read the third paragraph of section 1.2 of the lease into the record. Hagen interpreted the provision as one that would allow the landlord to install fiber optic wire through the slab below the tenant's leased premises. He agreed that repair was also allowed. His interpretation of the lease would be if the main sewer line under the property ruptured, then the landlord would be able to repair the main sewer line. He disagreed that it would include "any other pipe" saying they did not have any responsibility for the other sub lines. He agreed that section 1.2 did not state that and instead stated that repair of pipes was reserved to the landlord. He also agreed that in this case, a waterpipe ruptured. Following an objection by counsel that stated landlord had no obligation to repair anything under section 1.2, when Hagen was asked if 1.2 made it landlord's responsibility to repair the pipe, he said he interpreted it as "that I can repair it. It doesn't say I have to." He agreed that the word "reserve" meant that he was not giving it to the other party to the contract. He further agreed that his interpretation, which would allow them to hold back from automatically jumping in with a repair, might not be the same as the tenant's interpretation.

¶ 34    Hagen was then asked about section 6.1 and stated that it was his interpretation that it was "referring to structural repairs." He stated that, in his opinion, pipes were not structural items. He agreed that section 6.1 specifically referred to plumbing and pipes. He agreed that section 6.2 did not include the word pipes. He agreed that at no time did Wasabi replace or repair anything sub slab. He stated that Wasabi did consolidate the plumbing work to feed off of one line to one meter when it subsumed the ice cream parlor.

¶ 35    Hagen again testified that when he and Kim met at the building for the keys, that Shoppes at St. Clair would do exploratory work since they had to re-lease the space and Kim would pay the water bill. He agreed that he had nothing in writing from Kim stating that Kim would pay the water bill. He agreed that there was no evidence of the 850,000 gallons of water that leaked beneath the slab. He also agreed that after the leased premises were turned back over to Shoppes at St. Clair that the tenant had no responsibility to make any repairs. He stated that the only reason they were in court was because of the water bill which was Wasabi Sushi's responsibility. Since that time, everything escalated with attorney fees, interest, and expenses.

¶ 36    On redirect examination, Hagen testified that the contract stated that the lease was negotiated and "that no weight of construction shall be given one party or another as the drafter of this lease." He further stated, in regard to section 1.2, that the appurtenances granted in the lease included the pipes because they were part of the leased premises. He agreed that section 6.2, although not using the word pipes, did include plumbing, and the Illinois Plumbing License Law (225 ILCS 320/2 (West 2022)) stated that the words "plumber, plumbing and plumbing systems all refer to pipes." He stated that it was his interpretation of the contract that it was tenant's responsibility to repair the pipes. He further testified that a leak of this magnitude was not due to normal wear and tear. Following Hagen's testimony, Shoppes at St. Clair rested.

15

¶ 37     John Kim testified that as the CEO of Wasabi Management Company he was responsible for acquiring space to operate the restaurant. He stated that when they first looked at the building, it was two bays of equal size. He then contacted his broker about getting both bays to convert into a usable restaurant. No structural changes were made to the property. Except for adding bathrooms, no other modifications were made to the plumbing or piping on the property. They simply tapped into the existing infrastructure. No changes were made below the surface. He stated that Wasabi Sushi vacated the premises on January 15, 2022.

¶ 38     Kim testified that he found out about the leak from the water company, which told him that they shut the water off because there was a leak at the property involving 850,000 gallons of water on February 4, 2022. Kim then met with Hagen on February 11, 2022, at the site. Two of Hagen's associates and Joe Rushing, the water foreman for the City of O'Fallon, were all there. Kim did not have the key, so the O'Fallon Fire Department was called because they had access by way of a key in the lockbox. Once they had the key, everyone entered the premises and everything was "dry as a bone." At that time, Hagen told Kim that the leak must be outside since the restaurant was dry. He said the issue of payment never came up during the meeting or during the final walkthrough on March 28, 2022, which was delayed due to the plumbing work and the lack of water to deep clean the restaurant.

¶ 39     On cross-examination, Kim agreed that there were no issues in the 10 years they were at the location. He agreed that the piping had to be reworked with one dedicated water source since the ice cream parlor also had a water source. He confirmed that no work in combining the lines occurred below the surface. He agreed that section 1.2 reserved the right to install, maintain, use, repair or replace the pipes, to the landlord but did not reserve the pipes themselves. As to section 6.2, he stated that plumbing was not defined in the contract to include piping. He stated that in

16

each of his restaurants, he was responsible for anything visible to the eye. He stated the water pipes were not visible and he could not fix a problem that he could not see. He agreed that there was no water found in the restaurant. It was his interpretation that once you went underground, whether it was a power line or a water line, that was not a tenant's responsibility. He opined that section 6.1 left the pipe responsibility with the landlord because the pipes were outside of the leased premises.

¶ 40 Kim testified that Joe Rushing from the City of O'Fallon sent an email clearly stating that he, A&H, and the landlord "never were able to find where the leak was. So they ended up switching from using the waterline to the east side of the premises to the west side of the premises." He maintained that the problem was never located; they just switched lines. It was Kim's belief that the leak was "under the ground somewhere."

¶ 41 On redirect, Kim agreed that he did not know exactly where the leak was. Thereafter, Wasabi Sushi rested. The parties requested the court to allow them to submit proposed orders and findings of fact. The court granted the request.

¶ 42 On May 27, 2025, the court issued a judgment order. Therein, the court found the testimonies from Scott Summers, Michael Hagen, and John Kim, credible. The court found that the testimony established that before Wasabi Sushi occupied the premises, the water lines beneath the slab were reworked by Wasabi Sushi contractors.[1] The order stated that the construction was confirmed and detailed in section 1.1 of the lease. The court also noted, after citing sections 1.2, 2.5, 6.1 and 6.2, that one separate water line serviced Wasabi Sushi exclusively. The court concluded that pursuant to the lease, the $6,188.94 water bill was the responsibility of Wasabi Sushi. It further concluded that the language in section 1.2 "clearly reserves and excepts to the

---

[1]Upon review of the record, we found no support for this finding. In fact, we believe the evidence was to the contrary on this issue. The testimony stated that the lines were reworked but it was not necessary to break through the slab.

Landlord only the right to repair, and not the duty to repair" and that these "pipes, ductwork, conduits, utility lines" were part of the leased premises. It further noted that section 6.1 limited repair to plumbing and pipes "located outside the Leased Premises."

¶ 43    The court's order also noted the tenant responsibilities that included maintaining, replacing and keeping "in good repair and operating order all components exclusively serving the Leased Premises, whether located within or without the Leased Premises *** including but not limited to *** plumbing." Thereafter, the court took judicial notice of section 2 of the Plumbing License Law (225 ILCS 320/2 (West 2024)) which included pipes within the definition of "plumbing." The court also relied on section 12.7 of the lease, which required surrender of the premises "in good condition, reasonable wear and tear excepted." It noted that Hagen testified that the premises were not in good condition and the water leak was not due to reasonable wear and tear. Accordingly, the court found in favor of Shoppes at St. Clair and ordered Wasabi Sushi and Wasabi Management jointly and severally liable to Shoppes at St. Clair for damages in the amount of $52,544.05.

¶ 44    A supplemental order, issued on May 29, 2025, reduced the amount of the award to $50,000 pursuant to the Rule 222 affidavit. See Ill. S. Ct. R. 222 (eff. Jan. 1, 2011). The court noted that the reduction was required per the jurisdictional damage limitations of the LM division and Rule 222. Wasabi timely appealed.

¶ 45                                II. ANALYSIS

¶ 46    On appeal, Wasabi contends that the trial court's finding that there was a leaking pipe exclusively serving the leased premises was against the manifest weight of the evidence. Alternatively, Wasabi contends that the trial court erred in interpreting the lease because it failed to give effect to all provisions of the contract, the interpretation leads to absurd results, and the Plumbing License Law failed to support the court's interpretation.

18

¶ 47    The construction, interpretation, or legal effect of a contract is determined as a question of law and therefore, review of this issue is *de novo*. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005). However, the factual findings that inform the interpretation are given deference on review and should only be reversed where they are against the manifest weight of the evidence. *Asset Recovery Contracting, LLC v. Walsh Construction Company of Illinois*, 2012 IL App (1st) 101226, ¶ 74. " 'A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonably, arbitrary, or not based on the evidence.' " *Corral v. Mervis Industries*, 217 Ill. 2d 144, 154 (2005) (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). Reviewing courts do "not substitute [their] own judgment for the judgment of the trier of fact." *Id.* (citing *Kalata v. Anheuser-Busch Companies, Inc.*, 144 Ill. 2d 425, 434 (1991)). Substituting our judgment for that of the trial court includes findings of witness credibility, weight afforded to evidence and any inferences to be drawn from that evidence. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006).

¶ 48    Wasabi first takes issue with the trial court's finding that there was a leaking water pipe. Wasabi argues that there was no evidence submitted of an actual water leak and the evidence consisted solely of opinions that there was a leak because they were told that the "water meter was spinning." We agree that everyone was operating on the assumption that there was a water leak because the water meter was spinning and no visual confirmation of the 850,000 gallons of leaked water was ever made.

¶ 49    However, circumstantial evidence was presented in support of a water leak. "In civil actions, circumstantial evidence is not limited to instances where the circumstances support only one logical conclusion; instead, the sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom be reasonable." *Eskridge v. Farmers New World Life Insurance Co.*,

19

250 Ill. App. 3d 603, 610 (1993). Here, while it is undisputed that there was no evidence presented regarding either the accuracy or functionality of the water meter, Summers's affidavit confirmed that the water meter attached to the water line running to the Wasabi restaurant was spinning as if there was a water leak on February 18, 2022. Additionally, both Hagen and Kim testified that they were told the water meter was spinning and there was a leak. Further, while the actual leak was never visualized, Summers's testimony confirmed that once they capped the old line and put in the new line, the leak stopped. He clarified that that he believed the leak was fixed because the water meter stopped spinning once the old line was capped and the new line was hooked up. No testimony or evidence was submitted to controvert Summers's testimony. Accordingly, the trial court's finding of a water leak is not against the manifest weight of the evidence.

¶ 50 Wasabi also takes issue with the court's finding that the leaking pipe serviced the leased premises exclusively. It contends that because the leak was never visually confirmed, any finding of where the leak was located would also be against the manifest weight of the evidence. We agree that the testimony revealed that the plumber excavated both inside and outside of the building, but no leak was found. However, only after the water line attached to the Wasabi premises was capped, and a new line installed to those same premises, did the water meter stop spinning. It was undisputed that the spinning water meter was exclusive to the Wasabi premises. While we agree that the action could merely be coincidental, we also agree that the trial court finding that the leak was from a water pipe exclusively serving the Wasabi premises is equally feasible. See *id*. Accordingly, we hold that the trial court's finding that the leak exclusively served the leased premises was not against the manifest weight of the evidence.

¶ 51 Wasabi also argues, in the alternative, that even if there was a leak, the trial court erroneously interpreted the parties' lease. A lease is a contract between a landlord and a tenant to

20

which we apply ordinary principles of contract interpretation. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994). The principal objective in construing the document is to give effect to the intent of the parties. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). We look to the instrument itself to determine intent, focusing on the document as a whole not just isolated portions of the document. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). If the language is clear and unambiguous, the intent of the parties must be determined solely from the contractual language which is given its plain and ordinary meaning. *Central Illinois Light Co.*, 213 Ill. 2d at 153. "However, if the language of the contract is susceptible to more than one meaning, it is ambiguous." *Thompson*, 241 Ill. 2d at 441. Only if a contract is ambiguous may a court consider extrinsic evidence to determine the parties' intent. *Id.* Ambiguous contracts are strictly construed against the party that drafted the contract. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 119 (2004); see also *Clarendon America Insurance Co. v. Prime Group Realty Services, Inc.*, 389 Ill. App. 3d 724, 729 (2009) ("If an uncertainty arises concerning the meaning of the lease's terms, then the lease should be construed in the lessee's favor and against the lessor."). Because the interpretation of a contract is one of law, *de novo* review is applied. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). This means that no deference is granted to the trial court's decision. *People v. Morgan*, 2025 IL 130626, ¶ 22.

¶ 52    Wasabi first contends that the trial court ignored all of the provisions of section 6.2 of the contract and ignores the language in section 6.1. It argues that the lease uses the terms "pipes" and "plumbing", and the rules of construction require us to ascribe different meanings to the words. Wasabi further contends that section 6.2 frames the difference by referencing components that are foundational fixtures while section 6.1 uses words that require repair to the appurtenances which

are not foundational elements. It argues that the delineation is common sense and interpretation must follow the ordinary expectations of reasonable people.

¶ 53    We have reviewed the language in sections 1.2, 6.1, and 6.2 that delineate the responsibilities for repair by the tenant and the landlord. To be fair, the use of the words "pipes" and "plumbing" without definition or explanation of the difference is troubling and confusing. However, the confusion is clarified when all three sections are read in conjunction. Only then does it become apparent that the real issue does not stem from the missing definitions of pipe and plumbing, but from what comprised the "Leased Premises."

¶ 54    The "leased premises" definition was found in section 1.2 and stated,

> "The Leased Premises shall extend to the exterior faces of exterior walls or to the building line where there is no wall, or the center of those walls separating said premises from other leased premises in the Shopping Center, together with the appurtenances specifically granted in this Lease, but *reserving and excepting* to Landlord or its designee the right to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines and wires through hung ceiling space, column space, and partitions, in or beneath the floor slab or above or below the Leased Premises in other parts of the Shopping Center." (Emphasis added).

¶ 55    The act of "reserving and excepting" property is a legal term of art related to real property. "A 'reservation' is a right in favor of the grantor created out of or retained in the granted premises." Am. Jur. 2d, *Deeds* § 59 (2026). "It is a clause *** whereby the grantor reserves some new thing, issuing out of the thing granted that was not in *esse* before." *Id.* Only a property right held at the time of the conveyance can be reserved. *Id.* An "exception" is similar; however, "an 'exception' operates on the description of the property and withdraws from the description the excepted

22

property, [which is] usually a property interest that is already in existence." *Id.* "It prevents some part of the grantor's interest from passing to the grantee." *Id.*

¶ 56   With these legal concepts in mind, we again consider the language in section 1.2 that used the words "reserving and excepting." The lease language reserved a right with the landlord "to install, maintain, use, repair and replace pipes, ductwork, conduits, utility lines and wires." The lease also excepted certain portions of the property leased to Wasabi, thereby withdrawing them from the leased premises description. Those portions included the "ceiling space, column space, and partitions, in or beneath the floor slab or above or below the Leased Premises." Here, Summers, Hagen and Kim all adamantly maintained that the leak was below the foundation of the Wasabi Sushi restaurant. Pursuant to the lease, this portion of the property was retained by Shoppes of St. Clair when it excepted that portion of the property in the lease. Since the area of the leak was not part of the "Leased Premises" as defined by the lease, the responsibility to repair said leak remained with Shoppes of St. Clair and no reimbursement for the repair is warranted by Wasabi.

¶ 57   Further support for this interpretation is seen in sections 6.1 and 6.2, which specifically placed responsibility with Shoppes of St. Clair for repairs to the roof, foundations, load bearing items, plumbing, pipes, and conduits located outside the Leased Premises. As shown above, by using the terms "reserved and excepted" those parts of the building remained with the Shoppes of St. Clair and were not part of the leased premises. Similarly, section 6.2 placed the repairs within the leased premises with Wasabi and "all equipment and systems serving the Leased Premises exclusively." Wasabi was also required to replace all things necessary to keep the same in a good state of repair and operating order, including "all components exclusively serving the Leased Premises, whether located within or without the Leased Premises, including but not limited to air conditioning, ventilating, plumbing, sprinklering, heating and electrical installations, ceilings,

23

inside walls, carpeting and floor surfaces." Importantly, the language that required Wasabi to keep the "equipment and appurtenances thereof in good order, condition, and repair" would only allow Wasabi to make other "necessary repairs in and to the Leased Premises not specified in Section 6.1 hereof as being the responsibility of the Landlord." As noted above, section 6.2 required Shoppes at St. Clair to repair the roof, foundations, load bearing items, plumbing, pipes, and conduits located outside the leased premises, which based on the exception and reservations in section 1.2, included anything in or beneath the floor slab which was where the leak occurred based on the testimony of Shoppes at St. Clair's witness. Accordingly, we vacate the trial court's judgment in favor of Shoppes at St. Clair as to the $15,785 repair bill, the $5,907.79 award of interest, and the $2,367.75 administration fee and find in favor of Wasabi Sushi on the issue of repair.

¶ 58    Neither the trial court's interpretation of the contract, nor our own, affects the trial court's conclusion that it was Wasabi's responsibility to pay the utility bill. Section 1.2 specifically stated, "Tenant shall pay all utility charges relating to the Leased Premises which accrue after Landlord's tender of possession." That same requirement is further iterated in section 2.5 which required Wasabi to "pay promptly, as and when the same become due and payable, all water rents, rates and charges *** supplied to the Leased Premises." It was undisputed that one water line ran to Wasabi Sushi and said line was metered. It was also undisputed that Wasabi never paid the final water bill that amounted to $6,188.94. Wasabi did not appeal that portion of the trial court's decision and therefore, that portion of the judgment in favor of Shoppes at St. Clair, which amounted to $6,188.94, along with the $200 late fee pursuant to section 12.12 of the lease, is affirmed. Our conclusion renders the remainder of Wasabi's arguments moot, and therefore, they are not addressed.

24

¶ 59    Finally, we acknowledge that portion of the trial court's judgment that awarded $23,069.57 in attorney fees and court costs based on its judgment in favor of the Shoppes at St. Clair. The award of attorney fees is governed by section 11.5 which provides reimbursement to the prevailing party for "court costs, reasonable attorney's fees (in both the trial court and appellate courts) and all other reasonable expenses." While we have affirmed the judgment related to the water bill (and associated fees), we have vacated the judgment as to the repair (and the administration fee and interest). Accordingly, we also vacate the award of attorney fees and remand the case back to the trial court to reconsider the issue of attorney fees and costs and determine what reimbursement, if any, should be awarded to either party since both were prevailing parties in the litigation.

¶ 60                                    III. CONCLUSION

¶ 61    For the above-stated reasons, we affirm the trial court's judgment in favor of Shoppes at St. Clair regarding the water bill, reverse the trial court's judgment in favor of Shoppes at St. Clair regarding the repair bill and instead find in favor of Wasabi Sushi, reverse the award of attorney fees and costs, and remand the case for reconsideration of the attorney fee issue.


¶ 62    Affirmed in part, reversed in part, and remanded.

25